PEOPLE v POE

OPINION OF THE COURT

1. CRIMINAL LAW—PHOTOGRAPHS—WITNESSES—IDENTIFICATION.

Showing witnesses a number of police mug shots the night of a holdup and again the next morning, with defendant's photo being in both groups, would be within standard and proper identification procedures.

2. WITNESSES—REFRESHING MEMORY—EVIDENCE—LINEUP SHEETS.

The use of lineup sheets, with the remarks made by witnesses recorded thereon, to refresh witnesses' memory and to test their reliability was proper.

3. CRIMINAL LAW—EVIDENCE—LINEUP SHEETS—HEARSAY.

Police officer's testimony that two witnesses had made a positive identification of the defendant in a criminal case and the handwritten notations purporting to be the statement of the two witnesses recorded on lienup sheets were hearsay and not admissible under any rules of evidence where the quotations only served to show prior *consistent* statements.

4. CRIMINAL LAW—RECALLING WITNESS—CROSS-EXAMINATION—IDENTI-FICATION—HEARSAY—POLICE NOTES—POLICE RECORDS.

Trial judge erred in refusing to allow a police officer to be

REFERENCES FOR POINTS IN HEADNOTES

[1] 29 Am Jur 2d, Evidence § 367.

[2] 58 Am Jur, Witnesses § 579 *et seq.*
29 Am Jur 2d, Evidence § 372.
Refreshment of recollection by use of memoranda or other writings, 125 ALR 19.

[2, 3, 8] Admissibility of evidence of lineup identification as affected by allegedly suggestive lineup procedures, 39 ALR3d 487.

[3, 4] 29 Am Jur 2d, Evidence § 373.
Admissibility of evidence as to extrajudicial or pretrial identification of accused, 71 ALR2d 449.

[5] 30 Am Jur 2d, Evidence § 1002.

[6] 29 Am Jur 2d, Evidence § 371.

[7] 21 Am Jur 2d, Criminal Law §§ 313, 314.

[8] 29 Am Jur 2d, Evidence § 371 *et seq.*
Admissibility of evidence of photographic identification as affected by allegedly suggestive identification procedures, 39 ALR3d 1000.

recalled for cross-examination as to his original notes taken at the scene immediately after the robbery where identification procedures prior to trial were at least open to the suspicion of unfairness, there was error in the admission of hearsay testimony that could only tend to reinforce identification, and there were alterations in the police bulletin as to the description of the robber.

5. CRIMINAL LAW—EVIDENCE—POLICE NOTES—POLICE RECORDS.

Police should retain their original notes and records, especially those made at the scene.

CONCURRING OPINION

WILLIAMS, J.

See headnotes 1–5.

6. CRIMINAL LAW—IDENTIFICATION—PRETRIAL IDENTIFICATION.

*All things being* equal, *identifications of a defendant in a criminal case made prior to trial are inherently more reliable than those made "in court".*

7. CRIMINAL LAW—IDENTIFICATION—PRETRIAL IDENTIFICATION—COUNSEL—EXCLUSIONARY RULE—EVIDENCE—PROCEDURAL FAIRNESS.

*Rule that testimony as to pretrial identification procedures is subject to* per se *exclusion if the defendant was without counsel, should be* eliminated entirely *and an appropriate rule of special qualification of such evidence on the basis of the fairness of the procedures substituted.*

8. CRIMINAL LAW—LINEUP—DUE PROCESS.

*It would constitute lack of due process in a future case to fail to put a person in a lineup with the defendant where witnesses to a crime pick out a picture of defendant and a picture of that person as the probable criminal although defendant "came the closest", unless the police were able to satisfy the trial judge that this other person was unavailable after diligent, honest effort to find him or other circumstances indicate that this other person is not connected with the crime.*

Appeal from Court of Appeals, Division 1, Danhof, P. J., and V. J. Brennan and J. J. Kelley, Jr., JJ., affirming Recorder's Court of Detroit, Geraldine Bledsoe Ford, J. Submitted April 5, 1972. (No.

7 April Term 1972, Docket No. 53,109.) Decided November 29, 1972.

27 Mich App 422 reversed.

Ralph Poe was convicted of armed robbery. Defendant appealed to the Court of Appeals. Affirmed. Defendant appeals. Reversed and remanded for new trial.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Dominick R. Carnovale,* Chief, Appellate Department, and *Thomas R. Lewis,* Assistant Prosecuting Attorney, for the people.

*Philip A. Gillis,* for defendant.

ADAMS, J.

## Statement of Facts

On the evening of October 13, 1966, there was an armed robbery of a Wrigley's Supermarket in Detroit. Pringle Johnson, the assistant manager, was forced at gunpoint to give the man about $350. A cashier, Fannie Evans, was under the impression the robber wanted to cash a check and spoke to him. Another employee, Douglas Ballard, was about to go on a break when the robber told him he had better not leave. Gary Harbin, an employee, and Mitchell Matthews, a customer, observed the robber from a distance.

After the robber left, Johnson summoned the police. Officer Jones, one of the first officers to respond to the call, asked for a description of the robber. He relied on Johnson for the bulk of this

identification but his report was also based on the views of the other witnesses. According to Jones' report and testimony, the robber was described as "a Negro Male, thirty to thirty-five, five foot five, slim build, with a heavy beard and a medium mustache; the man was wearing a brown squashed down hat, a brown Italian knit sweater and green pants. He [Johnson] stated that this man also had a limp in his left leg and that his mouth was distorted when he talks." A teletype based on Jones' write-up altered 5'5" to 5'8", "heavy beard" to "needed shave," and "limp in left leg" to "limp in right leg." See Exhibit A p 621.

Several files of mug shots were shown to the witnesses that evening by police officers other than Jones. Matthews and Harbin picked out a picture of Poe. Johnson and Evans picked out a picture of Poe and another man, "Two-zero," but indicated that Poe came the closest. Ballard picked out two pictures. The next morning, pictures were again shown to Johnson, Evans and Matthews. The picture of Poe was again chosen as being the closest to the robber.

The police did not want to request a warrant based solely on the picture identification. As one officer explained, the other man, "Two-zero," showed a background of 15 armed robberies and Poe had not been known to be involved in any armed robberies. Every witness, except Ballard, was asked to be present at a lineup. The men participating in the lineups were of various ages. While Poe was in each lineup, "Two-zero" did not participate in any of them. According to the notations on the showup sheets, Johnson and Evans "positively" identified Poe. Harbin stated that although Poe looked like the robber, he could not testify to that in court. Matthews identified another man.

Poe was arrested and charged with armed rob-
bery. A jury trial was held in Recorder's Court.
Poe was represented by appointed counsel, Philip
A. Gillis. Since Poe maintained that he was inno-
cent, the whole trial rested on identification of him
as the robber. Johnson testified the robber had a
heavy mustache, was 5'8" or 5'9" tall, wore a
suede-type jacket, and limped only once with his
right leg. Other witnesses also disputed the de-
scription as testified to by Officer Jones. Poe was
32 years of age at the time of the trial and 5'9"
tall. He showed no limp and, when testifying,
showed no distortion of his mouth.

The jury found Poe guilty of robbery armed.
Upon appeal to the Court of Appeals, that Court
first remanded the case to recorder's court "for
post-conviction proceedings." On the hearing on a
motion for retrial, the trial court considered only
the issue of whether the court-appointed lawyer,
being inadequately paid, had inadequately repre-
sented his client. The trial court denied the motion
for retrial on the ground that Mr. Gillis had
performed an admirable job.

Appeal was again taken to the Court of Appeals.
The trial court's decision was affirmed. (27 Mich
App 422.) This Court granted leave, limited to the
issue of the admissibility of a police officer's testi-
mony pertaining to identification of defendant
made by witnesses at showups and handwritten
notations pertaining to lineup identification. (384
Mich 799.) The order was later amended to include
the issue of whether Officer Jones should have
been recalled for impeachment purposes with re-
spect to the testimony of an identifying *res gestae*
witness. (384 Mich 800.)

## I. *Identification*

As at trial, on this appeal the whole problem in

this case is one of identification. Four interrelated issues are involved: (1) discrepancies in the testimony of witnesses; (2) pretrial identification procedure; (3) the admissibility of police notes entitled "Record of Showup" and their submission to the jury during its deliberation; and (4) the court's refusal to recall the investigating officer who obtained the descriptions at the scene.

### (1) *Discrepancies in Testimony*

Officer Jones' report describing the robber, the testimony of the store witnesses, and the alterations in the police bulletin by interlineations to make it conform with the description given by the witnesses, and other discrepancies, would ordinarily be proper matters for jury resolution. The officer's original notes from which he made his police report were never used by him to refresh his memory or admitted as past recollection recorded. We shall have more to say of them under (4).

### (2) *Pretrial Identification*

The witnesses were shown a number of police mug shots the night of the holdup and again the next morning. Defendant's photo was in both groups. This would be within standard and proper identification procedures. However, two of the witnesses recalled having been shown photos on the day of the showup and Fannie Evans stated that when she went to the police station for the showup, she was permitted to see defendant before the showup. "I really didn't look at the others [in the showup] because I saw him [defendant] before I even got there and I recognized him." When Gary Harbin viewed defendant at a showup, men used for it, besides the 32-year old defendant, were two teenagers and a 58-year old man.

(3) *Admissibility of Police Notes*

The defense elicited testimony by the police to show that although Matthews and Harbin swore at trial that Poe was the robber, they did not make such positive identifications during the lineups. The lineup sheets with the remarks made by these two witnesses recorded thereon were submitted into evidence to make this point. The use of these documents to refresh the witnesses' memory and to test their reliability was proper. See, generally, 2 Gillespie, Michigan Criminal Law & Procedure (2d ed), § 598, p 775.

The defense objected, however, when the prosecution undertook to show by police testimony that both Johnson and Evans had made a "positive identification" of Poe. The sheets describing those two lineups were also admitted into evidence over defense counsel objection. According to the notations on these lineup sheets, Mrs. Evans, when identifying Poe, said: "That's him with the trench coat on." Mr. Johnson was quoted as saying: "That's him, that's him."

The defense contended that, although the lineup sheets could be admitted to impeach the testimony of Matthews and Harbin, the sheets involving the lineups in which Evans and Johnson were present could not be admitted since they did not fall into any exception to the hearsay rule. The quotations only served to show prior *consistent* statements. The two witnesses were never impeached on their lineup identifications of Poe.

The jury examined these sheets during the trial and again during their deliberations.

The courts below and the prosecutor rely upon the holding in *People v Londe,* 230 Mich 484, 487 (1925):

"The third question presented by the record relates to

the ruling of the court in permitting witnesses Mrs. Evans and John Kay to testify that they identified the defendant in the show-up room at police headquarters, *and in permitting John Donovan, a police officer, to testify as to what took place at the time of the identification.* It was proper for the witnesses who had seen the men at the time of the robbery to testify that they later identified the defendant as one of them. *And it was equally proper for the officer to testify under what circumstances the identification was made. That is as far as the witnesses were allowed to go in giving their testimony."* (Emphasis added.)

*Londe* restricts the police officer's testimony to "what took place" and under "what circumstances the identification was made" and not, as here, the nature or quality of the identification.

In *People v Mead,* 50 Mich 228 (1883), a woman who was sleeping in the "burgled" house testified that she saw the burglar plainly enough to recognize him afterwards and that two days later, while in her husband's company, saw defendant and told her husband she believed defendant to be the burglar. The husband was then put on the stand and related his wife's observances and recognition. Justice COOLEY, speaking for the Court, observed (p 230):

"The question was then put in this form: Did she recognize anybody? This was objected to, but allowed, and the witness answered: She did. The further question was then asked: Whom did she recognize? And the answer given was: This defendant. She recognized him as being the man that was in her bed-room on the first of November [the time of the burglary]. I told her to be sure, and she says, I am sure.

"It will be observed that in this the witness went altogether beyond the question, and beyond any permission that could be implied from the ruling of the judge. The question was simple: Whom did she recognize? It was also proper enough to put it, as introductory to

what the witness himself had to say respecting his own subsequent investigations. But *the witness,* not content with giving a simple answer to it, *added what in effect was a statement that his wife told him she recognized the respondent as the burglar. The statement was hearsay, and it was likely to be exceedingly mischievous, for much depended in the case upon this recognition.* "(Emphasis added.)

The police officer's testimony and the handwritten notations purporting to be the statements of Evans and Johnson recorded on these sheets were hearsay and not admissible under any rules of evidence.

### (4) *Refusal to Recall Officer Jones*

Officer Jones did not have the handwritten notes he had made on the night of the robbery with him at trial. After testifying, he was instructed to go home to find them. Meanwhile, Ballard, previously waived as a *res gestae* witness because of the prosecution's inability to locate him, was found and appeared in court. He was the first witness to say that the robber had only faked a limp and that the man had fled by a different route than that previously testified to. Ballard testified that he informed the police that the robber "kind of slipped and he jumped out of that limp; and he walked on out the door, walked across the street over to the empty parking lot." Defense counsel requested that Officer Jones be recalled. The trial court refused on the basis that defense counsel had already thoroughly cross-examined Officer Jones.

Ordinarily we would agree with the Court of Appeals that this was a matter for the trial court's discretion. In this case, however, we have identification procedures prior to trial that are at least open to the suspicion of unfairness, error in the trial in the admission of hearsay testimony that

could tend only to reinforce identification and, finally, a refusal by the trial judge to allow cross-examination of the police officer as to his original notes taken at the scene immediately after the robbery. In *People v Rosborough,* 387 Mich 183 (1972), we recently discussed the problem of police testimony and records. We cannot stress too strongly the importance of retention by the police of their original notes and records, especially those made at the scene, as in this case. Appended hereto is Exhibit A, the police bulletin. The alterations in the description of the robber can readily be seen. Under the circumstances of this case, it was vital that Officer Jones be recalled for cross-examination. The trial judge erred in refusing to allow this.

Remanded to the trial court for new trial.

T. M. KAVANAGH, C. J., and T. E. BRENNAN, T. G. KAVANAGH, SWAINSON, and WILLIAMS, JJ., concurred with ADAMS, J.

# APPENDIX

# EXHIBIT A

*Compl. + Witnesses picked the-*
*following mugs as good look-a-likes*
*# 200523   # 102720*

DETROIT POLICE DEPARTMENT *Heart shaped scar inside.*
Detective Division  *Left leg.*
*2259 Calvert   Ralph Lee*
October 13, 1966
TT-14868—8:15 PM

To     : Chief of Detectives.

Subject: Robbery Armed of the WRIGLEYS STORE, 3431 Joy Road,
TY-48650; Complainant PRINGLE JOHNSON, 30/N, of
21435 Scotia Lane, Royal Oak, 541-6429, (Assistant
Manager).

1.   At 8:10 PM this date, received a call from Patrolman
Roy Jones, Scout 10-12, reporting a radio run at 7:40 PM to 3431
Joy Road, "at the market, a holdup".

2.   The complainant stated that at about 7:15 p.m. this
date a lone Negro male entered the store and at the point of a
small black revolver robbed him of $350 which complainant gave to
thug after opening safe. The thug had stated that he wanted all
the bills. The thug escaped on foot across Joy Road going north
from view. *Kept appearing -other than hat.*
*which was crushed down on head.*
3.   DESCRIPTION:
*5'8   Norwood Share-*
N/M, 30-35, ~~5'5"~~, heavy beard, medium mustache,
brown hat, brown Italian knit sweater, green
pants, limped on ~~left~~ leg, mouth distorted
when he talked, armed with ~~small~~ black revolver.
*Long   bar.  38  cal.  Large*

4.   At the scene:

Det. Rufus Anderson, Robbery-B&E Bureau
Patr. Joseph Fidel,    "      "     "

5.   Assigned to the 10th Pct. and Robbery-B&E Bureau;
copy to Homicide Bureau.

*102720*

HAROLD F. HOGAN
Detective Lieutenant

Det. Lt. Hogan:hdu

*4 Witnesses*

① *Douglas Ballard n-17, 4000 Toledo   No Phone*
② *Gary Harbin n-17, 2601, Chrysler   961-7520*
③ *Fannie Evans n-40, 12714 Pinehurst   935-8866*
④ *Mitchell Mathews n-71, 2081 Hazelwood  898-0613 - Custom*
*All Witnesses can I.D*

WILLIAMS, J. *(concurring)*. I concur with the holdings of my Brother ADAMS and generally with his very pertinent observations.

In particular I agree with his observation: "In this case, however, we have identification procedures prior to trial that are at least open to suspicion of unfairness * * * ." *(Supra,* p 619.) I would go further. This case antedates *United States v Wade,* 388 US 218; 87 S Ct 1926; 18 L Ed 2d 1149 (1967) which has only prospective application under *Stovall v Denno,* 388 US 293; 87 S Ct 1967; 18 L Ed 2d 1199 (1967). Nevertheless, this case illustrates why the Sixth Amendment's right to counsel and a meaningful confrontation at trial has resulted in the requirement of presence of counsel at pretrial identification procedures. My Brother ADAMS itemizes several of the problems in this case which I shall repeat before commenting on them:

"However, two of the witnesses recalled having been shown photos on the day of the showup and Fannie Evans stated that when she went to the police station for the showup, she was permitted to see defendant before the showup. 'I really didn't look at the others [in the showup] because I saw him [defendant] before I even got there and I recognized him.' When Gary Harbin viewed defendant at a showup, men used for it, besides the 32-year old defendant, were two teenagers and a 58-year old man." *(Supra,* p 616.)

The first point I wish to make is to emphasize that had the two witnesses not testified to having seen the photos on the day of the showup and just prior thereto; had Fannie Evans not stated she was permitted to see the defendant before the showup; and had the information not come to light as to the farcical form of showup employed for Gary Harbin, the defendant's case would have

been immeasurably weakened. However, had defendant had counsel on these occasions, counsel presumably would have become aware of these things for trial use, which is one of the reasons *Wade* requires counsel at that time.

The second point is that while this case antedates *Wade* and *Wade* is prospective only, the companion case to *Wade, Stovall v Denno, supra,* is applicable on the facts and is also retrospective. *Stovall* holds that whether or not counsel is present for pretrial identification procedures, if the identification procedures employed are "unnecessarily suggestive and conducive to irreparable mistaken identification," then there has been a failure of due process and a *"Wade* hearing" is necessary to determine whether the identifying witness has an independent basis for testimony for "in-court" identification of the accused. Since this case involves a pre-indictment identification procedure, *Kirby v Illinois,* 406 US 682; 92 S Ct 1877; 32 L Ed 2d 411 (1972) does not *require* a *per se* exclusion of the out-of-court identification, but such testimony must be qualified under the normal evidentiary rules.

While this matter was not properly raised on appeal, since in any event the order in this case is to remand for new trial, these points should be considered as appropriate at such a trial.

This case strongly highlights a psychological and legal problem deserving the most serious consideration of the bench and bar. In reading the record and my Brother ADAM's opinion, one cannot escape the emphasis on what the witnesses at pretrial identification said and did. Such matters as whether or not an identifying witness did or did not identify the defendant; whether the identifying witness identified another person; whether the

identification was "positive" or "hesitant"; what
the identifying witness said; what the police rec-
ords of the lineup do or do not show; etc., all are
heavily stressed. And no wonder, because punish-
ment or discharge depends on whether the jury
finds beyond a reasonable doubt that the witnesses
identified the "right" man.

The defense, therefore, wants to show such
things as that "although Matthews and Harbin
swore at trial that Poe was the robber, they did
not make such positive identifications during the
lineups." And the prosecution wants to include
that "Mrs. Evans, when identifying Poe, said:
'That's him with the trench coat on' ", and that
"Mr. Johnson was quoted as saying: 'That's him,
that's him.' ", *(supra,* p 617) although "Johnson and
Evans picked out a picture of Poe and another
man, 'Two-zero,' but indicated that Poe came clos-
est."

From this emphasis on what happened and what
was said at the pretrial identification procedures it
is apparent that both parties thought the jury
would be influenced by identifying witness' impres-
sions at the time nearest the crime. This actually
is logically and psychologically sound. An impor-
tant consideration underlining my concurrence in
this case is the proposition that, all things being
*equal,* identifications made prior to trial are inher-
ently more reliable than those made "in court"
("That's the man"). Wigmore has characterized in-
court identifications as "violently suggestive." Wig-
more, *Evidence—Corroboration by Witness' Identi-
fication of an Accused on Arrest,* 25 Ill L Rev 550,
550–551 (1931); see also 4 Wigmore, Evidence (3d
ed), § 1130; Comment, *Prior Identification Evidence
& the Hearsay Objection,* 30 Rocky Mt L Rev 332
(1958); Wall, Eye-Witness Identification in Crimi-

nal Cases, pp 26–27, 181 fn 2, and Chapter V (1971, 2d printing). However, in *Gilbert v California,* 388 US 263; 87 S Ct 1951; 18 L Ed 2d 1178 (1967), the United States Supreme Court made testimony as to pretrial identification procedures subject to *per se* exclusion if the defendant was without counsel. *Kirby, supra,* restricted this *per se* exclusion to post-"indictment" situations. This writer believes that the *per se* exclusionary rule should be *eliminated entirely* and an appropriate rule of special qualification of such evidence on the basis of the fairness of the procedures substituted.

One final observation: the photographic procedures resulted in Johnson, Evans and Ballard originally picking out not one, but two pictures, Poe and "Two-zero," as the probable criminal, although "Poe came the closest." The second time around Johnson, Evans and Matthew picked Poe "as being *closest* to the robber" (this writer's emphasis) (p 614). In the actual lineup with Poe in it but "Two-zero" not in it "[a]ccording to the notations on the showup sheets, Johnson and Evans 'positively' identified Poe. Harbin stated that although Poe looked like the robber, he could not testify to that in court. Matthews identified another man." Under these circumstances I would hold in a future case that the failure to put a second person such as "Two-zero" in the lineup would constitute lack of due process under *Stovall,* unless the police were able to satisfy the trial judge that "Two-zero" was unavailable after diligent, honest effort to find him, or other circumstances indicate that "Two-zero" is not connected with the crime.

BLACK, J., did not sit in this case.